# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW MEXICO

JERRY D. ISLER,

       Plaintiff,

vs.                                            Civ. No. 10-00009 MV/WPL

THE NEW MEXICO ACTIVITIES ASSOCIATION,
THE BOARD OF EDUCATION OF THE CLOVIS
MUNICIPAL SCHOOLS, and RHONDA SEIDENWURM,
Superintendent of the Clovis Municipal School District, in
her Official Capacity

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Plaintiff's Motion for Preliminary Injunction **[Doc. No. 17]**.  A full-day evidentiary hearing was held on February 16, 2010.  Additionally, on January 27, 2010, this Court held a hearing on a prior motion to dissolve the temporary restraining order, at which the parties submitted testimony from seven witnesses, as well as exhibits.  It was understood by all parties that the evidence submitted at the January 27, 2010 hearing would be considered in determining whether Plaintiff's Motion for Preliminary Injunction should be granted.  The Court, having considered the motions, briefs, relevant law, and evidence submitted by the parties at the January 27, 2010 and February 16, 2010 hearings, and being otherwise fully informed, finds that Plaintiff's Motion for Preliminary Injunction is well-taken and will be **GRANTED**, as set forth below.

## <u>INTRODUCTION</u>

This case involves a constitutional challenge to a Bylaw of the New Mexico Activities Association ("NMAA"). The NMAA is a private/non-profit organization whose principal purpose is the regulation, direction, administration and supervision of interscholastic activities in the State of New Mexico; it is comprised of New Mexico public and private middle/junior high and senior high schools **[Ex. D at Section I-Page 2]**. The NMAA's authority is derived through state statute, the New Mexico Public Education Department, and through contractual agreement entered into with its member schools **[Doc. No. 29 at ¶2]**.

On December 16, 2009, the NMAA suspended Plaintiff Jerry Isler, Head Basketball Coach of the Clovis High School Boys' Basketball Program, from all coaching duties at Clovis High School for the remainder of the 2009-2010 season as a result of his alleged violation of NMAA Bylaw 6.1.3 (Undue Influence) **[Ex. BB]**. As a result of his suspension, the Clovis Municipal Schools terminated his coaching contract effective January 13, 2010 **[Ex. AA]**.

On December 18, 2009, Plaintiff filed the instant lawsuit in the Ninth Judicial District Court of the State of New Mexico and, on January 5, 2010, the NMAA removed the case to federal court. In this lawsuit, Plaintiff challenges the constitutionality of NMAA Bylaw 6.1.3, alleging that the provision he purportedly violated, 6.1.3(K), is unconstitutionally vague. He also alleges that Defendants violated his right to freedom of association by suspending and terminating him for his alleged violations of NMAA Bylaw 6.1.3(K).

NMAA Bylaw 6.1.3 provides in full:

**Undue Influence**

The use of any of the following inducements constitutes undue influence resulting in ineligibility for all high school athletic participation for 180 school days/365 calendar days:

| | |
|---|---|
| **A.** | Participant living with coach, principal, teacher, or school official without legal guardianship |
| **B.** | Any inducement to get parents or students to change residence for athletic/non-athletic purposes |
| **C.** | Offer of acceptance of money |
| **D.** | Reduction or remission of regular tuition (other than need-based financial aid available to all applicants) |
| **E.** | Offer or acceptance of board, room, or clothing |
| **F.** | Offer or acceptance of money for work in excess of amount regularly paid |
| **G.** | Transportation to school by any school official |
| **H.** | Offer or acceptance of school privileges not normally granted to other students |
| **I.** | Free or reduced rent for parents |
| **J.** | Offer for payment of moving expenses for parents |
| **K.** | Communication with student/parents by school personnel, that might be construed as inducement for them to attend a particular school |

**[Ex. D at Section VI-Page 2]**.[1]  The term "undue influence" is defined in the appendices of the NMAA Handbook, which contain the NMAA Bylaws, as "[i]nappropriate, unethical, and prohibited acts by which coach, sponsor or agent of the school persuades or attempt to persuade a potential athlete to transfer into his/her school" **[Ex. D at Section XIV-Page 12]**.

---

[1] The substance of Bylaw 6.1.3 appears at two other places in the NMAA Handbook. First, Bylaw 6.1.3 is duplicated word-for-word as Bylaw 6.3.5 **[Ex. D at Section VI-Pages 9-10]**.  Second, Section I of the NMAA Handbook, titled "General and Basic Information," contains provision 1.8, which provides that "[t]he use of any of the following inducements constitutes undue influence" and then lists, word-for-word, provisions A-K, as set forth above **[Ex. D at Section VI-Page 7]**.

## FACTUAL BACKGROUND

Prior to the instant dispute, Plaintiff Jerry Isler had been coaching basketball for more than twenty years **[Doc. No. 30 at 130:4-7]**.  He has coached at both the high school and collegiate levels **[Doc. No. 30 at 135:17-24]**.  For the past nine years, he has been Head Basketball Coach of the Clovis High School Boys' Basketball Program **[Doc. No. 30 at 130:8-13]**.

In approximately mid-July 2009, Mr. Isler received a call from Todd Lieb, the father of Lathan Lieb **[Doc. No. 30 at 101:12-103:3; 130:14-21]**.  Lathan Lieb had been a student at Dora High School during the 2008-2009 school year and had played for Dora High School's basketball team.  Todd Lieb informed Mr. Isler that he and his son were considering moving from Portales, New Mexico to Clovis, New Mexico and enrolling in Clovis High School **[Doc. No. 30 at 102:15-24, 130:14-21]**.  Mr. Lieb testified that he had been considering moving to Clovis for years; the Liebs had looked at purchasing a house in Clovis as long ago as 2005 **[Doc. No. 30 at 98:16-99:1; 101:12-21; 112:17-23]**.  His son Lathan, now a junior at Clovis, testified that he started thinking about moving to Clovis in grade school **[Doc. No. 30 at 166:16-167:17]**.  Todd Lieb wanted to speak with Mr. Isler in order to learn more about Clovis High School, its basketball program, and NMAA eligibility rules.  Mr. Isler informed Todd Lieb that he needed to speak to his supervisor, Brian Stacy, the Athletic Director of Clovis High School **[Doc. No. 30 at 102:15-25-103:12; 130:22-131:3]**.

Following the call with Todd Lieb, Mr. Isler contacted Mr. Stacy and thereafter a meeting was set up at Clovis High School **[Doc. No. 30 at 130:17-131:24]**.  The meeting was attended by Mr. Stacy, Mr. Isler, Clovis High School Boys' Assistant Basketball Coach Scott

Robinson, Mr. Todd Lieb, and Lathan Lieb **[Doc. No. 103:4-12; 131:15-24]**. During the meeting, a number of topics were discussed, including Clovis High School, its basketball program, eligibility rules, math classes, and dual-credit classes **[Doc. No. 30 at 103:4-104:22; 131:25-132:7]**. There is no evidence that any promises were made to the Liebs at this meeting, nor that anything was said during the meeting to induce Lathan Lieb to transfer to Clovis High School **[Doc. No. 30 at 104:5-15; Doc. No. 30 at 171:8-13]**. To the contrary, those present at the meeting testified that Mr. Isler and Mr. Stacy made it clear to the Liebs that they were not guaranteeing Lathan Lieb a position on the Clovis High School basketball team and that the extent to which Lathan made the basketball team and played would be determined, as it would for any other student, by his ability and performance **[Doc. No. 30 at 104:5-15]**. In fact, when Todd Lieb was asked if any promises were made by Mr. Isler at the meeting, he testified: "No. I mean, it was more the other way around. They were kind of telling us that, you know, you may just be on JV. . . . You may be on the C team" **[Doc. No. 30 at 104:5-15]**.

Following the meeting, Todd Lieb testified that he and his son made the decision to go forward with their plan to move to Clovis **[Doc. No. 30 at 104:24-106:3]**. Accordingly, the Liebs notified the Dora High School basketball coach of their intention to move **[Doc. No. 30 at 105:18-106:3]**. Immediately, thereafter, however, Lathan started receiving pressure from numerous members of the Dora community to stay at Dora High School **[Doc. No. 30 at 106:4-12]**. As a result of this pressure, Lathan felt torn between his desire to move to Clovis and his sense of loyalty to those at Dora and decided he would stay at Dora High School **[Doc. No. 30 at 106:13-107:2]**. Accordingly, approximately a week or two after the meeting at Clovis High School, Todd Lieb contacted Mr. Isler to inform him that Lathan would not be transferring to

Clovis High School **[Doc. No. 107:11-23; 132:14-21]**.  The testimony presented establishes that Mr. Isler said nothing during that phone call to attempt to change the Liebs' minds **[Doc. No. 30 at 107:11-23; 124:11-19; 132:13-133:3]**.  Apart from this single phone call informing Mr. Isler that Lathan would not be transferring to Clovis, there were no further communications between Mr. Isler and the Liebs following the meeting that had occurred at Clovis High School.

Lathan subsequently enrolled in Dora High School for the 2009-2010 school year **[Doc. No. 30 at 106:22-23]**.  However, in late August 2009, just after school commenced, Lathan changed his mind regarding the transfer.  While out golfing with his father on a Sunday, Todd and Lathan Lieb again discussed the topic of Lathan transferring to Clovis High School.  Lathan indicated to his father that he wanted to move forward with the transfer notwithstanding the pressure he had received from members of the Dora community, as he believed transferring to Clovis High School was in his best interests.  As Lathan's father agreed, he immediately contacted Mr. Isler **[Doc. No. 30 at 107:25-108:21; 122:4-10]**.  On the phone, Todd Lieb informed Mr. Isler that he and his son had decided to move to Clovis and asked if Mr. Isler would meet with them that day to discuss the transfer **[Doc. No. 30 at 108:15-109:14; 133:4-12]**.  Mr. Isler again contacted Mr. Stacy to see if he was available to meet with the Liebs.  Mr. Stacy was unavailable.  However, he expressed no concerns about Mr. Isler meeting with the Liebs **[Doc. No. 30 at 133:4-134:5]**.  Accordingly, Mr. Isler agreed to meet with the Liebs at his house.  Like the prior meeting, all the parties present at the meeting testified that no promises or inducements were made by Mr. Isler to Lathan or his father during the meeting **[Doc. No. 30 at 108:14-21; 109:14-110:4; 125:12126:1; 136:20-136:1]**.  To the contrary, the evidence is that the Liebs had made the decision to transfer Lathan to Clovis High School prior to that meeting

and that during the meeting the primary topic of discussion was not basketball, but rather the

social change accompanying a transfer from a small school to a large school **[Doc. No. 30 at**

**134:6-22]**.

Within a day or two following the meeting, Lathan withdrew from Dora High School and

enrolled at Clovis High School **[Doc. No. 30 at 122:4-17]**.

After the NMAA received a complaint concerning Lathan Lieb's transfer, the NMAA

began an investigation of the Clovis High School basketball program.[2]  The investigation was led

by Mr. Tripp, Executive Director of the NMAA.  During the investigation, Mr. Tripp negotiated

with Dr. Rhonda Seidenwurm, Superintendent of the Clovis Municipal Schools, the precise

penalty that would be imposed on Clovis High School (including on Mr. Isler and Lathan Lieb).

Dr. Seidenwurm testified that she was told that if she were to appeal any part of the final

negotiated penalty, then the entire negotiated penalty was subject to review and the NMAA

could impose harsher sanctions on the school, including suspending the Clovis High School

Boys' Basketball team from post-season play for up to two years **[Doc. No. 30 at 178:18-179:7]**.

Mr. Tripp confirmed that the  NMAA had the authority to suspend a school's program from post-

season competition for one or two years, as well as to impose a two-year suspension against a

coach **[Ex. 30 at 56:22-57:3; 84:15-85:3]**.  Dr. Seidenwurm decided not to appeal.

On December 16, 2009, the NMAA issued a letter to Dr. Seidenwurm, which set out the

penalty imposed on Clovis High School.  In that letter, Mr. Tripp informed Dr. Seidenwurm that

---

[2] While during the course of the NMAA's investigation, Mr. Isler and Mr. Stacy were
questioned regarding a few other students that had transferred to Clovis High School **[Ex. 6]**,
Mr. Tripp testified that the sanction imposed on Mr. Isler was based only on Mr. Isler's alleged
violation of the undue influence rule as to Lathan Lieb **[Doc. No. 30 at 66:15-18]**.

the NMAA was suspending Mr. Isler from all coaching duties at Clovis High School for the remainder of the 2009-2010 school year based on its finding that the Clovis High School Basketball Program had violated NMAA Bylaw 6.1.3 **[Ex. BB]**.  Later that same day, Dr. Seidenwurm notified Mr. Isler that the School District was terminating his coaching duties effective January 13, 2010 and that, in the interim, he was suspended from all coaching duties and was to have no contact with the Clovis High School Boys' Basketball Program **[Ex. AA]**. Mr. Isler, however, continues to teach science at Clovis High School.

Plaintiff acknowledges that he had no property interest in his coaching position and that his coaching contract for the 2009-2010 school year was terminable at will upon two-weeks notice **[Ex. CC]**.  Dr. Seidenwurm testified she did not intend to fire Mr. Isler prior to receiving the December 18, 2009 letter from the NMAA **[Doc. No. 30 at 177:12-16]**[3], but she also testified that she had other reasons for the action she took. **[Doc. No. 30 at 180:23 - 181:2].** Dr. Seidenwurm admits that she did not independently investigate Mr. Isler's alleged misconduct and was not given a copy of the NMAA's investigation even when she requested it, but instead relied upon the oral summaries of the NMAA findings provided by Mr. Tripp **[Doc. No. 30 at 179:11-180:2]**.

This Court notes that this is an unusual case in that the Defendants acknowledge that they cannot prove Mr. Isler did anything to influence Lathan Lieb to transfer to Clovis High School. Despite the extensive hearings and opportunity to present evidence, there was no substantive evidence that Mr. Isler induced Lathan Lieb to transfer to Clovis High School.  Gary Tripp, the

---

[3]  While Defendants repeatedly emphasize the at will nature of Plaintiff's employment, an at will employee may not be terminated for unconstitutional reasons.  *See, e.g., Ramkin v. McPherson*, 483 U.S. 378, 383-84 (1987).

Executive Director of the NMAA who was responsible for the final decision to suspend Mr. Isler from coaching, repeatedly admitted at both the January 27, 2010 and February 16, 2010 hearings that he did not know of any inducement offered to the Liebs, but instead was merely assuming that inducement took place as a result of the contacts that occurred between Mr. Isler and the Liebs and the circumstances surrounding those contacts.  For example, Mr. Tripp testified as follows:

> Mr. Tripp:  Well we're saying we don't know exactly what the discussions were between the parent and Coach Isler, but when they have been without the permission of administration and when they do not have academic [sic], then they have an inference of undue influence to us, that they're trying to entice that family to come to their school, and particularly when those conversations happen at a home.

> The Court:  So you don't know of any inducements, but you're assuming inducements took place?

> Mr. Tripp: Yes, Your Honor.

**[Doc. No. 30 at 94:16-95:2]**.

> Mr. Tripp:  I believe that when there's a conversation at the house, we don't know if [the Bylaws] have been violated or not.

> Counsel:  Okay.

> Mr. Tripp:  But we have to believe that if it's with a coach, in our opinion at the New Mexico Activities Association, there's athletic inducements going on.

> Counsel: Okay.  So you just – you don't have any evidence that there was any inducement going on there at all, do you?  You're just assuming, because of where the meeting took place, that there was inducements?

> Mr. Tripp: Yes, that would be correct.

**[Doc. No. 30 at 67:3-18]**

Likewise, Dr. Seidenwurm testified:

Counsel: Are you aware of . . . any evidence that Mr. Isler specifically promised the Liebs anything for them to come to school at Clovis?

Dr. Seidenwurm:  If you mean, if I have proof?

Counsel: Yes, yes.

Dr. Seidenwurm:  I do not.

**[Doc. No. 30 at 179:22-180:2; 181:9-15]**

Moreover, Mr. Tripp readily acknowledged that those present during the two meetings with the Liebs uniformly deny that any inducement took place and that the NMAA cannot establish that any inducement took place **[Doc. No. 30 at 70:18-71:5]**.  In fact, apart from Mr. Tripp's assumptions based on the fact that two meetings took place, the only evidence of inducement Mr. Tripp could identify was based on highly attenuated hearsay**.**  Mr Tripp testified that he had been told by the Dora High School basketball coach that he had been told by some of the Dora kids that they had been told by Lathan Lieb that he had been promised a starting position at Clovis and that Clovis would be a better basketball environment for him.  Mr. Tripp, however, testified that he never spoke directly to the kids at Dora who allegedly heard these statements by Lathan to the Dora High School coach **[Doc. No. 31 at 71:1-10; 91:1-93:17]**. This Court finds that this evidence, which has multiple levels of hearsay (not to mention significant bias issues, as it comes through students and a coach at Dora High School who were upset by Lathan's decision to transfer) lacks any credibility.  By contrast, this Court finds the testimony of Mr. Isler, Mr. Stacy, Mr. Robinson, Mr. Todd Lieb and Lathan Lieb to be credible. All five uniformly testify that there was no inducement by Mr. Isler and that nothing occurred at the meetings that could be construed as an inducement.  Furthermore, Logan Turnbow, in cross-examination by NMAA counsel, in the context of displacing kids on the team with transfers,

10

stated "the starting 5 is never set.  The starting 5 depends on who performs well at practice."

**[Doc. No. 30 at 161:11-18]**  Accordingly, this case does not involve any evidence of any of the

types of actual inducements listed in A through J of Bylaw 6.1.3, but rather involves an alleged

violation of subsection K, which prohibits "[c]ommunication with student/parents by school

personnel, that might be construed as inducement for them to attend a particular school."  And in

this case, the only factor pointed to by Defendants that could be construed as an inducement is

the fact that two meetings took place.

In contrast to the absence of any evidence of undue influence, this Court finds that there

is substantial evidence that Mr. Isler was genuinely trying to follow the proper protocol at all

times.  He did not initiate contact with the Liebs; he never phoned the Liebs **[Doc. No. 30 at

103:2-3; 148:10-15]**.[4]  He did not have any private conversations with Lathan **[Doc. No. 30 at

163:8-13]**.  Before each of his two meeting with the Liebs, he contacted his supervisor, the

Athletic Director of Clovis High School, who was in charge of processing the NMAA paperwork

required when students transfer to Clovis High School and requested that Mr. Stacy participate

in the meetings **[Doc. No. 30 at 148:10-15]**.  And at no time did Mr. Isler did not make any

promises or assurances to the Liebs **[Doc. No. 30 at 164:10-13]**.

_____

[4] Apart from the phone calls and two meetings, the only other evidence of any contact
between Mr. Isler and Todd Lieb was during a summer basketball camp where the two briefly
exchanged pleasantries **[Doc. No. 30 at 110:6-111:14**.}  Based on the testimony presented, this
Court finds that the exchange was nothing more than a brief conversation between two people
that had previously known each other from their school days.  The alleged conversation lasted
only a few seconds and no mention was made of the possibility of Lathan's transfer.  While the
NMAA also alleges that there was contact between Mr. Isler's son (who plays basketball) and
Lathan Lieb, there is no evidence that Mr. Isler's son did anything more than invite Lathan, who
he knew through basketball, to play at an open gym **[Doc. No. 30 at 115:6–117:14; 123:24-
124:10; 163:14-164:9]**.  Accordingly, this Court finds that the NMAA's innuendo that Mr. Isler
was using his son in attempt to influence Lathan to come to Clovis to lack any basis in fact.

By contrast, though Mr. Tripp asserts in his testimony that the NMAA provides a wide-array of general training and programs, the NMAA has failed to produce a single training document or video with regard to the handbook that would instruct coaches that the conduct at issue here is improper.  Likewise, this Court finds that Mr. Tripp's and Dr. Seidenwurm's testimony to the effect that everyone just knows that such contact is improper to be unconvincing.  Apart from Mr. Tripp's and Dr. Seidenwurm's vague assertions, there is simply no evidence that the NMAA provided any notice to coaches that parent-initiated contact, at which no promises or assurances are made, is improper.  In contrast to Mr. Tripp's and Dr. Seidenwurm's testimony, this Court finds the testimony of Mr. Isler and Mr. Stacy **(2/16/10 testimony at 11:10:20 to 11:11:04 and 10:42:14 to 10:42:38)** that they received no training regarding the NMAA's undue influence rules to be credible.  Accordingly, this Court finds that this is a situation in which Mr. Isler lacked notice that his conduct could be interpreted as violating NMAA Bylaw 6.1.3.

Finally, the evidence presented at the hearings indicates that Mr. Isler is highly respected by both the players on the Clovis High School Boys' Basketball Team and their parents and that his inability to coach has been difficult on the team.  Jack Snipes, whose son is on the Clovis High School Boys' Basketball Team, when asked to describe Coach Isler's relationship with his son, testified: "He's a mentor of his, a coach, a friend.  He's probably around him as much as I am right now." **[Doc. No. 30 at 154:6-9]**.  Mr. Snipes further testified that the NMAA suspension of Coach Isler has created "total chaos in everyone's life"—not just in the life of his son, but for family and friends as well **[Doc. No. 30 at 154:10-155:4]**.  Likewise, Logan Turnbow, a senior basketball player at Clovis High School, testified that the team is "pretty

shaken" by the present situation. **[Doc. No. 30 at 157:18-158:8]**.  When asked his relationship

and feelings toward Coach Isler, Mr. Turnbow testified:

> Coach Isler is my second father.  I see him more than I do my family right now.
> In general, my relationship with Coach Isler, he's my coach, first of all, he's . . .
> my father figure.  He – he's one of my best friends, honestly.  He's my mentor,
> probably one of my biggest heroes also.  He's honestly the reason I want to
> become a coach when I get out of college . . . .

**[Doc. No. 30 at 158:9-18]**.  Mr. Turnbow further testified that Mr. Isler's inability to coach the

remaining portion of the year would "devastate" him. **[Doc. No. 30 at 158:19-159:2]**.

Mr. Turnbow explained that he grew up watching Clovis High School basketball and that Coach

Isler is "the only man that [he] wanted to play for" **[Doc. No. 30 at 158:19-159:2]**.  In contrast,

Defendants have submitted no evidence that Mr. Isler is anything other than a benefit to the

Clovis High School Boys' Basketball Team and its players and even acknowledged his bond

with not just star basketball players, but their families as well **[Doc. No. 30 at 156:9-22]**.  It is

clear to this Court, that Mr. Isler cares deeply about the Clovis team and players.  He testified

that he is proud of the basketball team and his players **[Doc. No. 30 at 150:21-151:4]**.

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy."  *Attorney General of Oklahoma v.*

*Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009).  The standards for granting preliminary

injunctive relief are well-established:  "To obtain a preliminary injunction, the moving party

must demonstrate (1) a likelihood of success on the merits; (2) a likelihood that the movant will

suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in

the movant's favor; and (4) that the injunction is in the public interest."  *Id.* (internal quotations

omitted).  The Tenth Circuit has further cautioned that certain types of preliminary injunctions

are disfavored and thus "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (*en banc*), *aff'd* 546 U.S. 418 (2006).  These include:  preliminary injunctions that alter the status quo, mandatory preliminary injunctions, and preliminary injunctions that afford the movant all the relief he or she could recover at the conclusion of a full trial on the merits.  *Id.*

Here, Plaintiff seeks a preliminary injunction that would lift his suspension and require his reinstatement for the remainder of the 2009-2010 basketball season.  This Court finds that the injunction being sought is a disfavored type of injunction—not because it alters the status quo, as Defendants maintain, but rather because it is a mandatory preliminary injunction.  In *Schrier v. University of Colorado,* 427 F.3d 1253 (10th Cir. 2005), the Tenth Circuit explained that the status quo is the "last peaceable uncontested status existing between the parties before the dispute developed."  *Id.* at 1260 (internal quotations omitted).  The Tenth Circuit therefore rejected the argument that the plaintiff's request for preliminary injunctive relief reinstating him to his former position as Chair of the Department of Medicine (and removing the interim chair who had replaced him prior to the litigation) would alter the status quo.  Instead, the Tenth Circuit found that the last peaceable uncontested status existing between the parties before the dispute was the day before the plaintiff was removed as Chair of the Department (and subsequently filed suit).  *Id.* at 1259-60.  Nonetheless, the Tenth Circuit concluded that the injunction being sought by the plaintiff in *Schrier* was a disfavored "mandatory preliminary injunction," as it affirmatively required the nonmovant to act in a particular way (i.e., reinstate the plaintiff) and placed the issuing court in a position where it may have to provide ongoing

supervision to assure the nonmovant is abiding by the injunction. *Id*. at 1260-61.

As the last peaceable uncontested status between the parties in the instant case was on December 15, 2009—the day before Plaintiff received notice of his termination—this Court finds that the requested preliminary injunction does not alter the status quo. Nonetheless, as in *Schrier*, this Court finds that the injunction being sought is a disfavored mandatory injunction, as it requires the reinstatement of Mr. Isler. Accordingly, this Court finds that Plaintiff's request for a preliminary injunction "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *O Centro*, 389 F.3d at 975.

## ANALYSIS

**A.     Likelihood of Success on the Merits**.

This Court finds that Plaintiff has established a strong likelihood of success on the merits as to his claim that Bylaw 6.1.3(K) is unconstitutionally vague. Though this Court recognizes that this case occurs in the civil context, rather than the criminal context, and specifically in the context of a regulation governing school athletics, and thus the level of detail and specificity required is not as great as is required in the criminal context, *see West v. Derby Unified School Dist. No. 260*, 206 F.3d 1358, 1368 (10th Cir. 2000), nonetheless, this Court finds that Plaintiff has established a strong likelihood of success on the merits as to his claim that Bylaw 6.1.3(K) is unconstitutionally vague.

A rule may be unconstitutionally vague because it does not provide adequate notice to the public, or because it invites uneven and arbitrary enforcement. *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999); *J.S v. Blue Mountain School Dist.,* 2010 U.S. App. LEXIS 2388, at *52 (3d

Cir. Feb. 4, 2010).  In determining if a rule is unconstitutionally vague, courts will look to any

guidelines that were provided for interpretation of the rule.  *J.S.*, 2010 U.S. App. LEXIS 2388, at

*52.

A rule is vague on its face when it "'either forbids or requires the doing of an act in terms

so vague that men of common intelligence must necessarily guess at its meaning and differ as to

its application.'"  *Flanagan v. Munger*, 890 F.2d 1557, 1569 (10th Cir. Colo. 1989) (quoting

*Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)).  Courts have explained that a rule

should comport with a "rough idea of fairness . . . and provide fair warning that certain kinds of

conduct are prohibited."  *Flanagan*, 890 F.2d at 1569 (internal quotations omitted).

Further, the Supreme Court has recognized that rules which lack terms susceptible of

objective measures and thus encourage an individual to proscribe their own guiltless behavior

are impermissibly vague.  *Baggett v. Bullitt*, 377 U.S. 360, 368 (1964); *Cramp v. Board of Public

Instruction*, 368 U.S. 278, 286 (1961).

The NMAA Bylaw at issue here, 6.1.3(K), prohibits communications between school

personnel and students or parents that "might be construed as inducement for them to attend a

particular school."  The Bylaw, however, provides no guidance whatsoever as to the meaning of

the phrase "might be construed as an inducement" and thus no guidance as to what conduct is

actually prohibited.  There has been ample opportunity to present evidence to this Court

regarding any guidance or training provided to school personnel as to interpretation of the

Bylaw, or any written policy further clarifying what the NMAA believes "might be construed as

an inducement."  The NMAA, however, has failed to produce any evidence that would put

school personnel, such as Mr. Isler, on notice that the conduct at issue here would be prohibited

16

by the Bylaw or to provide any clarification whatsoever as to NMAA's interpretation of the phrase "might be construed as an inducement."

While the NMAA does point out that the term "undue influence" is defined in the appendices of the NMAA Handbook as "[i]nappropriate, unethical, and prohibited acts by which [a] coach, sponsor or agent of the school persuades or attempt to persuade a potential athlete to transfer into his/her school" **[Ex. D at Section XIV-Page 12]**, this definition does little to clarify the ambiguity embodied in Bylaw 6.1.3(K).  No examples of what would be considered "inappropriate" or "unethical" are provided and nothing in this definition would put Mr. Isler on notice that the conduct at issue here would be prohibited by the NMAA; clearly his supervisor, Mr. Stacy, was not put on notice either.  Moreover, apart from this vague definition, the NMAA has failed to provide any written guidance whatsoever

Further, there is no evidence that the NMAA provided any training to either Mr. Isler or to his supervisor Mr. Stacy as to the NMAA's interpretation of its undue influence rules. Notably, Mr. Isler made a point of consulting his supervisor when he was contacted by the Liebs, and like Mr. Isler, Mr. Stacy had no notice that the NMAA might view the communications at issue here as a violation of the NMAA  Bylaws.

Based on the testimony and evidence presented to this Court thus far, it appears that there is no objective measure as to what "might be construed as an inducement" pursuant to Bylaw 6.1.3(K).  Rather, what might be construed as an inducement appears to depend primarily on the perceptions of Mr. Tripp.  Moreover, in his testimony before this Court and during his investigatory interview with Mr. Isler and Mr. Stacy, Mr. Tripp notes a number of things that appear to this Court to constitute innocent conduct, but which he views as suspicious.  Moreover,

even after two days of testimony, it is not clear to this Court where Mr. Tripp draws the line between permissible and impermissible communications.  The vagueness of the standards, and the fact that their interpretation is left largely in the discretion of Mr. Tripp, lends itself to arbitrary and inconsistent application.

Finally, this Court notes that the cited Bylaw, Bylaw 6.1.3, addresses the eligibility of athletes.  In its introductory section, it provides that violation of the foregoing results in ineligibility for participation in student athletics.   Thus, on its face, it is not clear that the specific Bylaw cited applies to coaches.

In short, this Court finds that Bylaw 6.1.3(K) provided no notice to Mr. Isler that his conduct was allegedly in violation thereof.  There is no objective measure of what "might be construed as an inducement" and this Court believes that what is prohibited by Bylaw 6.1.3(K) is so vague that school personnel must necessarily guess as to what conduct is prohibited.  Accordingly, as the Bylaw appears to lack any standard whatsoever and its enforcement appears to be left largely to the whim of Mr. Tripp, this Court finds that Plaintiff has established a strong likelihood of success as to its claim NMAA Bylaw 6.1.3(K) is unconstitutionally vague.  *See, e.g., Weaver v. Nebo School Dist.*, 29 F. Supp. 2d 1279, 1286 (D. Utah 1998) (requirement impermissibly vague where it required teacher and coach to guess whether her speech was permissible); *Dunn v. McKinney*, 622 F. Supp. 259 (D. Wyo. 1985) (rule prohibiting police deputy from "voluntarily maintaining or establishing associations or dealing with known criminals except in the line of duty and with the knowledge" of the sheriff was unconstitutionally vague as to the terms "know" and "criminal").[5]

---

[5]  In contrast to Plaintiff's claim that Rule 6.1.3(K) is unconstitutionally vague, this Court does not find that Plaintiff has established a likelihood of success as to his claim that the rule is

**B.**     **Irreparable Harm**

Defendants argue that Plaintiff will not be irreparably harmed, as he has an adequate

remedy at law.  While this Court acknowledges that in many employment cases, damages will be

an adequate remedy, this Court finds the present case is not a typical employment case.  In this

case, Plaintiff has devoted some twenty-three years to coaching **[Doc. No. 30 at 136:9-19]**.  He

has previously coached at the collegiate level and moved to high school coaching in order to

balance the needs of his family **[Doc. No. 30 at 135:17-24]**.  Now that his family obligations

have eased, he seeks to return to collegiate coaching **[Doc. No. 30 at 135:17-136:8]**.  His

success in making this transition depends on his record as a high school coach and is directly

linked to the success of the Clovis High School Boys' Basketball Team.  If he is unable to coach

_____

overbroad due to the limitations it imposes on his freedom of association.  Among other things, this Court notes that in *TSSAA v. Brentwood Academy*, 551 U.S. 291 (2007), the United States Supreme Court made it clear that an athletic association's interest in enforcing its rules, including undue influence rules, will sometimes justify certain restrictions on the First Amendment rights of its voluntary participants.  However, the vagueness of the alleged athletic association rule was not at issue in *TSSAA v. Brentwood Academy*.  To the contrary, the Supreme Court explicitly noted that as that case came before the Supreme Court, it was "settled that the coach's pre-enrollment solicitation violated the [athletic association's] anti-recruiting rule and that [the coach] had ample notice that his conduct was prohibited." *Id.* at 294.  Moreover, *TSSAA v. Brentwood Academy*, provides an excellent example of the type of clarity that could be provided though guidelines to a rule, but is lacking here.  Unlike the Bylaw at issue here, the rule in *TSSAA v. Brentwood Academy* contained advisory commentary explicitly instructing coaches that it is not permissible for a coach to contact a student or his or her parents prior to his or her enrollment in the school regardless of whether the student has an athletic record.  *TSSAA v. Brentwood Academy* 304 F. Supp. 2d 981, 984-86 (M.D. Tenn. 2003).  The commentary also included guidelines for understanding the rule and what constitutes undue influence.  These guidelines instruct that "[a]ny student or family or individual that contacts a coach about attending a school where he or she coaches should be informed that they need to contact the principal, admissions department, or guidance department if they have an interest" and that "[a]ny meeting with coaches regarding athletes or prospective athletes or their families should be at the request of the family to the individual(s) responsible for admissions and should take place at the school." *Id.* at 985-86.  The NMAA could have provided similar guidance, however,  it chose not to do so.

for the remainder of the season, the team is not only harmed, but his coaching record will be

tarnished.  More significantly, however, Mr. Isler has presented credible evidence that if he is

not allowed to return to coaching this season, colleges, as well as high schools, will assume that

the allegations of undue influence are true and will further assume that Mr. Isler engaged in

unethical conduct in recruiting Lathan Lieb.  Mr. Isler testified that whether he is guilty or not,

the stigma associated with his suspension will stay with him and that not only will it "basically

eliminate any opportunity to get a college coaching position," but may preclude him from getting

any coaching job, despite 23 years of successful coaching **[Doc. No. 30 at 136:9-19]**.  In light of

the allegations at issue here and their potential to effectively end Plaintiff's successful 23-year

coaching career, this Court finds that Plaintiff has established irreparable injury.  Money simply

cannot compensate Plaintiff for the loss of a career that he is clearly passionate about and to

which he has devoted the past 23 years of his life and the loss of his reputation.  Plaintiff is still a

young man who should be able to build on a successful 23 year career, rather than see it end on

the basis of a vague regulation and no evidence of undue influence.

This case is not unlike the situation presented in *Bordelon v. Chicago School Reform Bd.*

*of Trustees*, 8 F. Supp. 2d 779 (N.D. Ill. 1998).  In that case, the District Court granted a

preliminary injunction requiring the reinstatement of a school principal who had been placed in

an administrative position to his former position, explaining:

> For every day that Plaintiff remains assigned to his administrative position,
> Plaintiff is denied the opportunity to perform his chosen profession. Plaintiff has
> dedicated significant time and energy to serving the community in his capacity as
> Principal. Therefore, Plaintiff suffers when he is unable to perform in that
> capacity. . . . In addition to suffering these losses, Plaintiff will also be harmed in
> that, if the reassignment goes unremedied, Plaintiff's resume will necessarily
> contain a reference to his removal from the position of Principal of Kozminski
> and will indicate that his current position is that of an administrator in the Central

20

Office. Money will not adequately compensate Plaintiff for these losses and we thus conclude that Plaintiff has suffered an irreparable injury for which no adequate legal remedy exists.

*Id.* at 789; *see also Bruder v. Smith*, 2005 WL 3502269, *4 (E.D. Mich. Dec. 22, 2005) (adverse effect to plaintiff's reputation constituted irreparable injury).

In this case, Defendants' conduct is not only depriving Plaintiff of coaching for the remainder of the basketball season, but risks depriving Plaintiff of a career about which he is extremely passionate and which he has spent more than twenty years building. Accordingly, this Court concludes that Plaintiff has established irreparable injury.

## C.      Balance of the Hardships

This Court finds that the balance of hardships tips decidedly in Plaintiff's favor. As discussed in the prior section, Plaintiff has established that Defendants' actions may cause him not only to lose his ability to coach on a collegiate level, but may effectively preclude him from having any future coaching career. By contrast, Defendants have had difficulty articulating any real damage that they would suffer should Mr. Isler be permitted to coach the remaining few weeks left in the 2009-2010 basketball season.

While the Board of Education and Dr. Seidenwurm contend that a preliminary injunction would improperly infringe on their rights to supervise, hire, and fire employees, Dr. Seidenwurm acknowledges that prior to the suspension imposed by the NMAA, she had no intention of terminating Plaintiff for the 2009-2010 season. **[Doc. No. 30 at 177:12-16.]** Dr. Seidenwurm, herself, testified that she did not conduct her own independent investigation regarding Mr. Isler's conduct, but instead relied on the NMAA's investigation. The testimony indicates that Mr. Isler is a dedicated and effective coach that cares deeply about his players. In fact, based on the

testimony presented, this Court finds that Plaintiff has clearly established that it would be

advantageous to the Clovis High School Boys' Basketball Team, and the individual players on

that team, if Plaintiff were reinstated.  Accordingly, in the context of this case, this Court finds

that any tangential harm to the Board of Education's and Dr. Seidenwurm's right to hire and fire

employees is minimal compared to the concrete harm Plaintiff stands to suffer if he is not

reinstated.  *See, e.g., Thompson v. Southwest School Dist.*, 483 F. Supp. 1170, 1184-85 (W.D.

Mo. 1980) (issuing preliminary injunction requiring reinstatement of suspended teacher and

noting that the balance of hardships tipped decidedly in the teacher's favor where the school

board's suspension of her on the basis of immoral conduct would seriously hamper her ability to

pursue a teaching career and there was no evidence that plaintiff was incompetent or that her

students would be adversely affected by her reinstatement).

Likewise, the NMAA relies on abstract notions of harm, rather than concrete evidence

that it would be harmed if Mr. Isler were allowed to coach.  The harm asserted by the NMAA is

that allowing Mr. Isler to coach would effectively allow the circumvention of its Bylaws.  While

the Court has no doubt that the NMAA has a significant interest in promoting a level playing

field by preventing the recruiting of players, as noted above, here the NMAA has failed to

present evidence of undue influence or any attempt to recruit.[6]  While the Code of Ethics for

---

[6] During the hearings, the NMAA asserted that the purpose of its rules discouraging direct contact between coaches of schools and players for other member school was to prevent the displacement of local teenagers by transfer students.  Mr. Tripp testified: "We don't want to displace kids that have grown up in that community, that have earned the right to wear that purple uniform and respresent their school and have done everything that has been asked to them." **[Doc. No. 30:13-25].**  Notably, however, the only Clovis High School basketball player that was questioned as to this topic by counsel for the NMAA, Logan Turnbow, testified that he welcomed transfers, stating: "I want to play with the best and I want to be with the best, and I want to have the most competitive five out there that we can possibly have. . . . If you don't like it, man up and do what you can to get your spot back . . . ." **[Doc. No. 30 at 159:16-24]**.  Mr.

School Personnel set forth in the NMAA handbook recognizes "the supreme importance of the pursuit of truth" **[Ex. D at Section I-Page 6]**, subsection (K) of NMAA Bylaw 6.1.3, as interpreted in the context of this case, has more to do with perception than the pursuit of truth. This is not a case where there is a challenge to the existence of an anti-recruiting rule as a whole; Plaintiff acknowledges that sections A-J of the Bylaw provide sufficient guidance to coaches. Rather, it is a challenge to a specific provision that fails to provide guidance such that a person of reasonable intelligence understands what contact is prohibited. Accordingly, this Court finds that the potential harm to the NMAA from the alleged circumvention of Bylaw 6.1.3(K) that would take place should Plaintiff be allowed to coach for the next few weeks is greatly outweighed by the potential harm to Plaintiff should he not be allowed to coach.

Accordingly, for the foregoing reasons, this Court finds that the balance of hardships tips strongly in favor of Plaintiff.

**D.       Public Interest**

Finally, this Court finds that the public interest would not be harmed by issuing a preliminary injunction. As noted above, the evidence indicates that Mr. Isler plays an important and meaningful role in mentoring and advising members of the Clovis High School Boys' Basketball Team. He has been described as a mentor, friend, and second father to the boys.[7] Additionally, the evidence indicates that Mr. Isler's absence has created great turmoil for the

---

Turnbow further explained that he did not know anyone at Clovis who had lost a starting position to transfers because the "starting five is never set," instead the starting five depends on who performs well at practice **[Doc. No. 30 at 161:11-18]**

[7] While in its brief, the Board of Education asserts that it has a strong claim on the public interest when acting to rid itself of a potentially ineffective, disloyal, or dishonest employee, there is no evidence that Mr. Isler was anything other than an effective coach who was extremely devoted to the players on his team.

players and has left a void in the team's coaching needs.  Though Assistant Basketball Coach

Scott Robinson has been serving as interim Head Coach, no one has stepped in to replace the

coaching role previously filled by Mr. Robinson.  Additionally, Mr. Isler testified that some of

the seniors on the basketball team are being actively recruited by colleges.  While Mr. Isler,

having previously coached basketball at the college level, can provide insight both to colleges

and to the boys being recruited, he has felt that it would be inappropriate to do so in light of his

suspension and termination, which prohibits him from having any contact with the Clovis High

School Boys' Basketball Program **[Ex. AA]**.  Accordingly, for all the foregoing reasons, this

Court finds that it is in the best interest of the students athletes on the Clovis High School Boys'

Basketball Team that Mr. Isler be reinstated for the remainder of the basketball season including

any post-season tournament games.

  While this Court acknowledges that the public is larger than just the student body at

Clovis, the only harm Defendants have identified are those related to maintaining a level playing

field and the perception of fairness to other teams if Mr. Isler is allowed to continue coaching in

light of the contact he had with the Liebs prior to Lathan's enrollment at Clovis High School.

While such arguments might be more persuasive if there was evidence of actual undue influence,

in the absence of such evidence, this Court finds that the public is not served by suspending a

coach and harming his reputation based on an unsubstantiated assumption that he engaged in

wrongdoing.

  In light of the significant and tangible benefit to the students on the Clovis High School

Basketball Team by Plaintiff's reinstatement, and the absence of tangible evidence of harm to the

public at large, this Court finds that the granting of a preliminary injunction is in the public

interest.

## CONCLUSION

In conclusion, this Court finds that each of the four factors weighs strongly in Plaintiff's favor and that even under the heightened standard imposed in the context of mandatory preliminary injunctions, Plaintiff has established that he is entitled to preliminary injunctive relief.  It is therefore ordered that Plaintiff's Motion for Preliminary Injunction **[Doc. No. 17]** is **GRANTED**.

Defendant NMAA is hereby ordered to allow Plaintiff Jerry Isler to coach for the remainder of the 2009-2010 season, including any post-season tournament games,  and Defendants the Board of Education of the Clovis Municipal Schools and Dr. Rhonda Seidenwurm, as Superintendent of the Clovis Municipal Schools,  are hereby ordered to reinstate Plaintiff as Head Coach of the Clovis High School Boys' Basketball Program for the remainder of the 2009-2010 basketball season, including any post-season tournament games.

Plaintiff shall pay Defendants security pursuant to Federal Rule of Civil Procedure 65(c) in the amount of **One Thousand Dollars ($1,000.00)**, to be paid within thirty days of the entry of this Order.

DATED this 19th day of February, 2010.

_____
**MARTHA VÁZQUEZ**
**Chief United States District Judge**